# United States Court of Appeals
## For the Eighth Circuit
_____

No. 21-2749
_____

Daniel C. Matousek, individually and on behalf of all others similarly situated; Teresa J. Cantu, individually and on behalf of all others similarly situated; Leah M. Maloney, individually and on behalf of all others similarly situated

*Plaintiffs - Appellants*

v.

MidAmerican Energy Company; The Board of Directors of MidAmerican Energy Company; MidAmerican Energy Company Pension and Employee Benefits Plans Administrative Committee; John Does, 1-30

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: April 13, 2022
Filed: October 12, 2022
_____

Before SHEPHERD, ERICKSON, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Like many companies, MidAmerican offers a retirement plan to its employees. Some thought it saddled them with unreasonably high costs and low-

quality investments. In their complaint, however, they failed to identify better alternatives, so we affirm the district court's[1] decision to dismiss.

## I.

Company-sponsored retirement plans follow one of two models. The first is a defined-benefit plan, which provides retirees with "a fixed payment" regardless of performance. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). In this type of plan, the employer is generally on the hook if plan assets fall short. *Id.* at 1620–21. From the viewpoint of participants, the main advantage of a defined-benefit plan is the certainty of receiving a fixed stream of payments at retirement.

MidAmerican selected the other type, a defined-contribution plan, which can rise in value over time but includes no fixed payments. The amount available at retirement depends on the choices that participants make: when and how much to contribute, what investments to select, and when to start withdrawing money. *See Spano v. Boeing Co.*, 633 F.3d 574, 576, 585 (7th Cir. 2011); *see also Hughes v. Nw. Univ.*, 142 S. Ct. 737, 740 (2022) (explaining that the funding comes from "pretax contributions" from employees and "matching contributions" from employers). It can also depend on how well the plan managers carry out their fiduciary duties, including their diligence in keeping costs low and their skill in selecting "which investments" belong "in the plan's menu of options." *Hughes*, 142 S. Ct. at 742.

According to Daniel Matousek and the other plaintiffs, MidAmerican's plan did neither well. First, the plan's investment committee let recordkeeping expenses spiral out of control. *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (defining these expenses as paying for "the day-to-day operations of the plan itself"). According to the complaint, a larger plan like this one should have lower fees.

---

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa, now retired.

Second, the investment committee allegedly failed to "monitor all plan investments and remove [the] imprudent ones." *Hughes*, 142 S. Ct. at 740. Some consistently underperformed. Others cost too much. Either way, keeping these investments showed that the investment committee (and the directors who appointed them) must have been "asleep at the wheel." *Davis*, 960 F.3d at 483.

The district court granted MidAmerican's motion to dismiss. Without mentioning the recordkeeping allegations, it concluded that Matousek and the other plaintiffs had failed to plead meaningful benchmarks for "assessing the performance of the challenged funds."

## II.

We review the dismissal de novo, "accepting as true the allegations . . . in the complaint and drawing all reasonable inferences in favor of the nonmoving party." *Id.* at 482 (quotation marks omitted). A complaint can only survive a motion to dismiss if it contains "'sufficient factual matter' to state a facially plausible claim for relief." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The allegation here is that the plan's fiduciaries have violated their duty of prudence, which is about how they must act. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009). If they failed to use the same "care, skill, prudence, and diligence under the circumstances" as "a prudent man," then they have breached their duty. 29 U.S.C. § 1104(a)(1)(B). The process is what ultimately matters, not the results. *See id.*

A plaintiff typically clears the pleading bar by alleging enough facts to "*infer* . . . that the process was flawed." *Davis*, 960 F.3d at 482–83 (quotation marks omitted). The key to nudging an inference of imprudence from possible to plausible is providing "a sound basis for comparison—a meaningful benchmark"—not just alleging that "costs are too high, or returns are too low." *Id.* at 484.

## III.

To manage the "day-to-day operations" of the plan, MidAmerican hired Merrill Lynch, which served as the plan's recordkeeper. *Id.* at 482. It was tasked with "track[ing] the balances of individual accounts, provid[ing] regular account statements," offering various other services, and making sure the plan was complying with regulatory requirements. *Hughes*, 142 S. Ct. at 740. In return, Merrill Lynch received $1.9 million to $3.1 million in fees per year, which translates to between $326 and $526 per plan participant.

The claim here is that these amounts were too high. In the absence of "significant allegations of wrongdoing," *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014), the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less. *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 579–80 (7th Cir. 2022); *see also Sweda v. Univ. of Pa.*, 923 F.3d 320, 330 (3d Cir. 2019) (holding that the plaintiffs plausibly alleged a breach-of-fiduciary-duty claim when the plan spent millions more than "similar plans" paid "for the same services").

## A.

The plaintiffs allege that no more than $100 per participant is reasonable for a plan with approximately $1 billion in total assets and 5,000 participants. Even if the fees here look high, we cannot infer imprudence unless similarly sized plans spend less on the same services. *Albert*, 47 F.4th at 579–80.

First, however, we need to determine what those services are. Two documents fill in the details. One is a participant-disclosure form, which describes the services offered by the plan and the costs accompanying them. The other is an "Annual Return/Report of Employee Benefit Plan"—otherwise known as a Form 5500— which discloses the aggregate payments made to the plan's recordkeeper. *See Davis*, 960 F.3d at 484 n.3 (explaining that these documents are "embraced by the pleadings" and can be considered by the district court on a motion to dismiss).

According to the participant-disclosure forms, the cost of Merrill Lynch's "suite of administrative services" ranges between $32 and $48 per participant. In return, Merrill Lynch safeguards "assets provided by outside service providers," keeps "track of participant accounts and transactions," and provides "call centers, websites, account statements[,] and educational materials." These are, in the words of the complaint, "the suite of administrative services typically provided . . . by [a] plan's 'recordkeeper.'"

So what about those larger numbers in the complaint? A portion are indirect "revenue-sharing payments," which account for no more than $37 per participant per year. The remainder appears to come from what Merrill Lynch received from its other, non-recordkeeping services: investment advice for those with self-directed brokerage accounts; commissions for individual trades; and trading, loan-origination, returned-payment, and check-service fees. Each is "charged against the account of [individual] participant[s] . . . rather than on a [p]lan-wide basis."

The Form 5500s, which describe Merrill Lynch's "*total* compensation" for "services rendered to the plan," seem to bear this out. (Emphasis added). According to the form's "service codes," Merrill Lynch's compensation includes investment-management fees, redemption fees, shareholder-servicing fees, and securities-brokerage commissions. In plain English, the per-participant fees cover more than just standard recordkeeping services.

For a benchmark to be "sound" and "meaningful" here, it must do the same. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). After all, we have been clear that the key to stating a plausible excessive-fees claim is to make a like-for-like comparison. *See Davis*, 960 F.3d at 485.

B.

Rather than point to the fees paid by other specific, comparably sized plans, the plaintiffs rely on industry-wide averages. But the averages are not all-inclusive:

they measure the cost of the typical "suite of administrative services," not anything more. And using this information creates a mismatch between Merrill Lynch's total compensation, which includes everything it does for MidAmerican's plan, and the industry-wide averages that reflect only basic recordkeeping services.

The first source, published by a consulting group called NEPC, says that no similarly sized retirement plan paid more than $100 per participant for recordkeeping, trust, and custodial services. MidAmerican's plan compares favorably, with the fees for these basic recordkeeping services totaling between $32 and $48 per plan participant. NEPC's report says nothing about the fees for the other services that Merrill Lynch provided, which means it cannot provide a "sound basis for comparison" for anything else. *Meiners*, 898 F.3d at 822; *see Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (rejecting a comparison to industry averages because the plaintiff "ha[d] not pleaded that the services that [the plan's] fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cite[d]").

The second source, the 401K Averages Book, is similarly unhelpful. It suggests that the average plan with 2,000 participants and $200 million in assets paid $160 per participant in revenue-sharing and $5 in recordkeeping-administration fees. Neither includes fees arising out of participant-initiated transactions like "loans" and "distributions." And the revenue-sharing category consists of fees "received by other service providers to the plan," including "recordkeepers, advisors[,] and platform providers."

It is almost impossible to tell if these figures provide a meaningful benchmark. *See Davis*, 960 F.3d at 484–85. For one thing, they leave out the total fees charged for individualized services like "loans" and "distributions," just like the NEPC Report, making them a less-than-helpful benchmark for the larger, total-compensation numbers in the complaint. For another, they analyze smaller plans: those with less than half the number of participants and under a quarter of the total

assets.  *See Smith*, 37 F.4th at 1169 (discounting comparisons to smaller plans that "might offer fewer services and tools to plan participants").

IV.

The plaintiffs tread on familiar ground with their investment-by-investment duty-of-prudence claims.  *See, e.g.*, *Davis*, 960 F.3d at 484; *Meiners*, 898 F.3d at 823–24.  As the Supreme Court recently explained, fiduciaries like MidAmerican's investment committee "normally ha[ve] a continuing duty of some kind to monitor investments and remove imprudent ones."  *Hughes*, 142 S. Ct. at 741.  The complaint alleges that the committee should have removed five investments from MidAmerican's lineup, each of which was a poor performer, cost too much, or both.

Beyond these bare allegations, there still must be a "sound basis for comparison—a meaningful benchmark."  *Meiners*, 898 F.3d at 822.  In one case, a combination of a "market index and other shares of the *same* fund" did the trick, but there is no one-size-fits-all approach.  *Id.* (emphasis added) (discussing *Braden*, 588 F.3d at 595–96).  Nudging the complaint past the plausibility threshold depends on the "totality of the specific allegations."  *Id.* (citation omitted).

The plaintiffs' approach in this case is multifaceted.  The complaint starts by comparing the *performance* of three of the five funds to their "peer groups."  Then it evaluates the *expense ratios* of all but one fund to the mean and median expense ratios in their groups.  And finally, it analyzes the expenses *and* performance of two of the funds against alternative investments.  None clears the pleading bar.

-7-

A.

Start with the peer-group performance comparisons for three of the funds in MidAmerican's lineup: Oakmark Equity and Income Investor, Dodge & Cox International Stock, and Aristotle Small Cap Equity I. The peer group for each contains hundreds of funds. The allegation is that these funds performed worse than their peer-group averages over one-, three-, five-, and ten-year periods.

On its own, the raw performance data provided by the plaintiffs falls short of providing a "meaningful benchmark." *Davis*, 960 F.3d at 484. The main reason is that the composition of the peer groups remains a mystery. The complaint says that Oakmark Equity and Income Investor is in the "Non-target date Balanced" category and that Dodge & Cox International Stock is in the "International Equity" category. But there is no explanation of what types of funds are in each group, much less the criteria used to sort them. And for Aristotle Small Cap Equity I, the complaint does not even identify a peer group.

With so little information, we have no way of knowing whether the peer-group funds provide a "sound basis for comparison." *Meiners*, 898 F.3d at 822. Among the missing details is whether they hold similar securities, have similar investment strategies, and reflect a similar risk profile. If they are indeed different, then the peer-group data is unlikely to be "sound" or "meaningful" on its own. *Id.*

Compare the information in the complaint to what worked in *Braden*. There, the plaintiffs relied on "the *market index* and other shares of the *same fund*." *Id.* at 822 (emphasis added) (citing *Braden*, 588 F.3d at 595–96). The reason why those two comparisons turned out to be "meaningful" was that tracking the market index was the stated investment goal of the fund the plaintiffs challenged. *See Braden*, 588 F.3d at 595–96 (noting that the funds had "underperformed the market indices they were designed to track"). Here, by contrast, we have limited information about

-8-

each of the challenged funds,[2] and know even less about the funds in each peer group.

## B.

To be fair, the complaint provides mean and median expense-ratio data for two of these funds—Oakmark Equity and Income Investor and Dodge & Cox International Fund—and for two others. Once again relying on peer-group data, the plaintiffs allege that the expense ratios of these four funds eclipse both the mean and median expense ratios for their respective peer groups.[3]

The problem here echoes what we have already said about the raw performance data. There is no way to compare the large universe of funds—about which we know little—to the risk profiles, return objectives, and management approaches of the funds in MidAmerican's lineup. The bottom line is that the aggregate data fails "to connect the dots in a way that creates an inference of imprudence." *Davis*, 960 F.3d at 486.

## C.

In one final attempt to clear the pleading bar, the plaintiffs offer individualized benchmarks for two investments: Dodge & Cox International Stock and Oakmark Equity and Income Investor. In their view, finding less-expensive and superior-performing investments should be enough to nudge their claim from "conceivable to plausible." *Iqbal*, 556 U.S. at 682–83.

---

[2]For Aristotle Small Cap Equity I, for example, there is nothing in the complaint about fees. In *Braden*, by contrast, the plaintiffs provided expense ratios and compared them with "other shares of the same fund" to plausibly plead that they were too high. *See Meiners*, 898 F.3d at 822 (citing *Braden*, 588 F.3d at 595–96).

[3]For the other two funds that allegedly have excessive fees, the complaint places Dodge & Cox Stock in the "Domestic Equity" category and PIMCO Total Return Instl Revenue Share in the "Domestic Bond" category.

For Dodge & Cox International Stock, the complaint points us to Vanguard International Growth Fund. The former, according to its prospectus, has a *value* strategy: it typically invests in "well-established . . . companies that, in Dodge & Cox's opinion, appear to be temporarily undervalued by the stock market but have a favorable outlook for long-term growth." The latter, by contrast, has a *growth* strategy: it "invests mainly in common stocks of non-U.S. companies that are considered to have above-average potential for growth." Just from their contrasting investment styles, the two have "different aims, different risks, and different potential rewards that cater to different investors." *Davis*, 960 F.3d at 485.

We reach the same conclusion about the American Balanced R6 Fund, which the complaint insists is a benchmark for Oakmark Equity and Income Investor. The American fund "uses a balanced approach to invest in a broad range of securities," including *both* growth and value stocks. The Oakmark fund, by contrast, "uses a value investment philosophy" by buying stock in a "relatively small number" of companies trading below their intrinsic value. These two funds, much like the other two, are "just different." *Davis*, 960 F.3d at 486. So using either as a benchmark for the other would neither be "sound" nor "meaningful." *Id.* at 484.

V.

One loose end remains. The district court dismissed the complaint with prejudice without giving the plaintiffs a chance to amend it. We conclude that there was no abuse of discretion. *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1367 (8th Cir. 2022).

Although litigants are "freely give[n] leave" to amend, *see* Fed. R. Civ. P. 15(a)(2), they still have to "follow [the] proper procedures," *Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014). And here, the plaintiffs never requested leave to amend, much less "submitted an amended complaint." *Far E. Aluminium Works*, 27 F.4th at 1367; *see* N.D. & S.D. Iowa R. 15 ("A party moving to amend . . . a pleading . . . must electronically attach to the

-10-

motion . . . the proposed amended . . . pleading.").  A failure to do either is reason enough to reject their argument now.  *See In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884–85 (8th Cir. 2009); *see also United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737, 742 (8th Cir. 2014) (explaining that district courts are under no obligation "to invite a motion for leave to amend if the plaintiff [does] not file one").

VI.

We accordingly affirm the judgment of the district court.

_____